Mark LANE, Plaintiff,

v.

RANDOM HOUSE, INC., Defendant.

No. Civ.A. 93–2564 RCL.

United States District Court,
District of Columbia.

Jan. 26, 1995.

Mark L. Davidson, Washington, DC, for Plaintiff.

Henry S. Hoberman, Baker & Hostetler, Washington, DC, for Defendant.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

Defendant Random House, Inc. has moved for dismissal of Plaintiff Mark Lane's complaint pursuant to Fed.R.Civ.P. 12(b)(6). Alternatively, Random House has moved for summary judgment under Fed .R.Civ.P. 56. Upon consideration of the filings of counsel and the relevant law, Random House's motion for summary judgment is hereby GRANTED on all counts.

Random House has also requested costs and attorneys' fees. As prevailing party, Random House is entitled to costs as specified by Fed.R.Civ.P. 54(d)(1) and Local Rule 214. The request for attorneys' fees is DENIED.

## I. LEGAL STANDARD

Because the parties have submitted evidence outside of the complaint, including copies of the disputed advertisement and book, the court will treat Random House's motion as one for summary judgment. Fed.R.Civ.P. 12(b)(6). Summary judgment is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. E.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2551–52, 91 L.Ed.2d 265 (1986). Inferences drawn from the facts must be viewed in the light most favorable to the party opposing the motion. E.g., Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1607, 26 L.Ed.2d 142 (1970). If summary judgment is to be denied, there must be evidence on which the jury could reasonably find for the plaintiff. Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). But if the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial," summary judgment may be granted. Celotex, 477 U.S. at 322, 106 S.Ct. at 2551.

■ As this case arises under the District Court's diversity jurisdiction, 28 U.S.C. § 1332, the law of the District of Columbia governs. The Rules of Decision Act, and hence Erie Railroad v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), do not strictly apply with respect to D.C. law; nonetheless, the court will apply D.C.'s substantive law for reasons of uniformity and respect for the D.C. Court of Appeals. Anchorage–Hynning & Co. v. Moringiello, 697 F.2d 356, 360–61 (D.C.Cir.1983).

Based upon these standards, the court concludes that summary judgment in favor of Random House is appropriate on all of Lane's claims.

## II. FACTUAL BACKGROUND

This is a libel case concerning an advertisement that appeared in The New York Times on two occasions in late August, 1993. The advertisement announced publication by Random House of Gerald Posner's Case Closed, a book supporting the Warren Commission's conclusion that Lee Harvey Oswald, acting alone, assassinated President John F. Kennedy. The theme of the book is captured near the bottom of the advertisement—"ONE MAN. ONE GUN. ONE INESCAPABLE CONCLUSION."—followed by the promotional exhortation to "READ: CASE CLOSED BY GERALD POSNER."

Lane's objection is to the body of the advertisement where his photograph appears along with five other literati whose theories about the Kennedy assassination are well-known to American readers and filmgoers.

Each photograph is accompanied by a direct quote; and each quote is contrary to the views espoused by Posner in his new book. Above the six photographs is the caption: "GUILTY OF MISLEADING THE AMERICAN PUBLIC."

Immediately after the advertisement appeared, Lane protested to both *The New York Times* and Random House. His demand for a retraction was rejected. Random House indicated that it would not re-run the advertisement—but only because the pre-publication promotional campaign for Posner's book was finished.

Lane does not deny the quote attributed to him in the advertisement: "There is no convincing evidence that Oswald fired a gun from the sixth-floor window of the Book Depository or anywhere else on the day of the assassination." Still, Lane argues that he was injured in two respects. First, he objects to the unauthorized use of his photograph, name and notoriety in promoting the sale of *Case Closed*. Second, he seeks damages for the disparagement of his integrity and candor arising from the perceived suggestion in the advertisement that he has been intellectually dishonest with the American people.

### III. ISSUES

The first three counts alleged by Lane deal with misappropriation. Count one is infringement of right of publicity; i.e., violation of Lane's exclusive right to publicize and benefit from the value of his identity, reputation and work. Count two is misappropriation of celebrity; i.e., non-consensual use of Lane's name, likeness and reputation to promote and sell the book *Case Closed*. Count three is appropriation of personal identity; i.e., exploitation of Lane's identity and persona as the most prominent and recognizable Warren Commission critic.

The second distinguishable claim by Lane is contained in his fourth count—the tort of false light. Lane claims that Random House sullied his reputation and disparaged his credibility by knowingly depicting him in a false light and thereby intentionally causing him mental anguish and emotional distress.

Finally, in count five, Lane claims defamation. According to Lane, Random House knew or could easily have determined that Lane had not been charged with nor convicted of fraud on the American public. Nevertheless, with actual malice or extreme recklessness, Random House twice published the offending advertisement. Because the falsity of the statement, "GUILTY OF MISLEADING THE AMERICAN PUBLIC," was objectively determinable, and because the statement was likely to be believed as factual, Lane contends that he was defamed. The appellation "GUILTY" was untrue; Lane was neither charged with nor convicted of misleading his readers.

As a result, Lane says he has not experienced the demand of previous years for his views and commentary; he has encountered increased difficulty in securing production for his other written works; and he anticipates reduced lecture bookings, fewer opportunities for publication, and diminished ability to attract significant clients for lucrative retainers. These concerns have caused Lane mental anguish and emotional distress. He places a $10 million price tag on these assorted grievances, in the form of actual, compensatory, presumed and punitive damages. Additionally, he requests attorneys' fees and costs.

Random House, in its motion for summary judgment, advances these arguments: (1) the advertisement in question contains protected opinion rather than a verifiably false statement of fact; (2) the advertisement constitutes privileged fair commentary on Lane's conspiracy theory; (3) the "newsworthiness" and "incidental use" privileges bar liability for misappropriation, as does the First Amendment; and (4) Lane can not satisfy the standards for the tort of false light. Random House also requests attorneys' fees and costs.

The court will consider separately Lane's major claims—misappropriation, false light and defamation—then briefly address the issue of attorneys' fees.

### IV. MISAPPROPRIATION

Lane's first three counts—infringement of right of publicity, misappropriation of celeb-

rity, and appropriation of personal identity— are indistinguishable as a legal matter. They will be dealt with as a single cause of action for misappropriation.

Conceding that an advertiser's purpose in using someone's identity is central, Lane argues that Random House has exploited his individuality by portraying him in an advertisement for mere commercial gain. *See, e.g., Midler v. Ford Motor Co.,* 849 F.2d 460, 462 (9th Cir.1988) (unauthorized use of sound-alike voice is exploitation if not done for informative or literary purpose). According to Lane, his identity and likeness were misappropriated to promote a book not about him personally, but about conspiracy arguments in which he has been involved as a disputant. *See Tellado v. Time–Life Books, Inc.,* 643 F.Supp. 904, 914 (D.N.J.1986) (plaintiff's picture used solely to hype product, not to depict history of Vietnam war).

These arguments are without merit. Among the principal objectives of *Case Closed,* as set forth in the book's preface, is to resolve the "arguments raised by leading conspiracy critics, such as Anthony Summers, Mark Lane, Jim Marrs, and others ...." Mark Lane is clearly more than a single combatant in a pervading conflict. He is one of the protagonists; without Lane and his cohorts, the controversy over the Kennedy assassination may well have been put to rest by the Warren Commission.

Because Lane's picture and quotation are newsworthy and *incidentally related to a protected speech product,* they cannot form the basis for a successful misappropriation claim. Random House may invoke either the newsworthiness privilege or the incidental use privilege.

### A. *Newsworthiness Privilege*

■■■■ The newsworthiness privilege applies to advertisements for books, films, and other publications concerning matters of public interest. A plaintiff cannot recover for misappropriation based upon the use of his identity or likeness in a newsworthy publication unless the use has "no real relationship" to the subject matter of the publication. *Klein v. McGraw–Hill, Inc.,* 263 F.Supp. 919, 921 (D.D.C.1966) (quoting *Dallesandro v.*

*Henry Holt & Co.,* 4 A.D.2d 470, 166 N.Y.S.2d 805, 806 (Sup.Ct.1957)).

■■■ Lane cannot seriously contend that the discussion of him in *Case Closed* is not newsworthy. Moreover, "[i]t has always been considered a defense to a claim of invasion of privacy by publication ... that the published matter complained of is of general public interest." *Pearson v. Dodd,* 410 F.2d 701, 703 (D.C.Cir.), *cert. denied,* 395 U.S. 947, 89 S.Ct. 2021, 23 L.Ed.2d 465 (1969). Nor can Lane credibly maintain that he has "no real relationship" to Posner's book. Lane has devoted much time and effort establishing himself as paladin of the conspiracists. It is too late for him to retreat to the sidelines as a means of shielding himself from criticism.

In a case not unlike this one, the newsworthiness privilege was upheld as a defense against the unauthorized use of author Ayn Rand's name in a promotion of a book by another writer. The advertisement suggested that Rand would have approved of the ideas presented in the new book. But the court concluded that "a comparison to another author is, of necessity, always newsworthy and of interest to the public, which must consider whether or not to purchase the book." *Rand v. Hearst Corp.,* 31 A.D.2d 406, 298 N.Y.S.2d 405, 412 (Sup.Ct.1969), *aff'd,* 26 N.Y.2d 806, 309 N.Y.S.2d 348, 257 N.E.2d 895 (1970).

Lane's position is even weaker than Rand's. Her name was appropriated to suggest that someone else's ideas might be compatible with her own. Lane's name was appropriated to suggest that his own writings, scrutinized in Posner's book, were themselves the raison d'etre for the book's publication.

To discredit this rather unvarnished application of the newsworthiness privilege, Lane seeks refuge in commercial speech doctrine. Even if a critique of his book is deemed newsworthy, Lane contends that an *advertisement* comprising a critique of his book is entitled to a lesser degree of protection. However, "it is a far-fetched contention that [a photograph] is used for purposes of trade merely because it is employed to illustrate a book dealing with the subject to which the

plaintiff has made important contributions." *Klein,* 263 F.Supp. at 921.

The court will re-visit the topic of commercial speech in Parts IV(B) and VI(C), *infra.* Meanwhile, it is important to note that the backdrop for this case is "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks...." *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964).

■ While the newsworthiness privilege may not apply to an advertisement for a non-speech product, it does apply to advertisements for speech products—even those that propose a commercial transaction. Lane's theories about a pivotal and baffling public issue are manifestly newsworthy; serious analyses of his theories are derivatively newsworthy; and an advertisement promoting the sale of a book containing such analyses retains a newsworthiness immunity against a claim of misappropriation.

### B. Incidental Use Privilege

■ The second defense advanced by Random House against Lane's misappropriation charge is the "incidental use" privilege. Newsworthiness and incidental use are related privileges, but the latter focuses on the public nature of the activities referenced in the alleged misappropriation. A person's name or likeness "is not appropriated by mere mention of it, or by reference to it in connection with legitimate mention of his public activities...." Restatement (Second) of Torts § 652C, cmt. d (1977).

■ In opposition, Lane turns once again to his commercial speech paradigm. Commercial speech indicia, states Lane, are threefold: (1) a paid-for ad, that (2) refers to a specific product, and (3) is motivated by economic gain. When those ingredients are present, Lane's version of the First Amendment affords no immunity. Unauthorized commercial speech that exploits another's identity, persona or celebrity in advertising is not protected.

But this argument begs the question. The very nature of the incidental use privilege is to exclude certain material from the rubric of commercial speech. Because Lane's criteria for identifying when the commercial speech doctrine is to be invoked are deficient, the court can dispense with his rationale without even deciding how much protection is accorded commercial speech. To be sure, the Random House advertisement is paid-for; it refers to a particular product; and it is motivated in part by economic gain. While all three of Lane's ingredients are present, they are not sufficient to conclude that the advertisement is commercial speech.

■ "The fact that the defendant is engaged in the business of publication ... out of which he makes or seeks to make a profit, is not enough to make the incidental publication a commercial use of name or likeness." Restatement (Second) of Torts § 652C, cmt. d (1977); *accord Ault v. Hustler Magazine, Inc.,* 860 F.2d 877, 883 (9th Cir.1988) (lampooning an anti-pornography activist is not misappropriation even if done to enhance a magazine's profits), *cert. denied,* 489 U.S. 1080, 109 S.Ct. 1532, 103 L.Ed.2d 837 (1989). "It would be illogical to allow respondents to exhibit [speech products] but effectively preclude advance discussion or promotion of their lawful enterprise." *Guglielmi v. Spelling–Goldberg Prods.,* 25 Cal.3d 860, 160 Cal. Rptr. 352, 603 P.2d 454, 462 (1979).

A similar conclusion was reached only a few months ago in a case that parallels this case in virtually every respect. The court granted defendants' motion for summary judgment in a lawsuit brought by Robert Groden, an author and lecturer on the Kennedy assassination. Groden was pictured in the same advertisement that Lane challenges here. Groden claimed commercial appropriation of his name and likeness under New York law and false advertising under the Lanham Act. *Groden v. Random House, Inc., et al.,* No. 94 Civ. 1074 (S.D.N.Y. Aug. 22, 1994).

"[T]he fact that the Advertisement uses plaintiff's name and photograph to indicate the nature of the contents of *Case Closed* — namely, a critique of the work of the pictured conspiracy theorists—brings it within the

ambit of the incidental use exception. *See Namath v. Sports Illustrated,* 48 A.D.2d 487, 371 N.Y.S.2d 10, 11–12 (1st Dept.1975) (use of plaintiff's photograph for purposes of soliciting subscriptions is an incidental use where photograph gave reader indication of contents of magazine), *aff'd,* 39 N.Y.2d 897, 386 N.Y.S.2d 397, 352 N.E.2d 584 (1976); *Rand,* 298 N.Y.S.2d at 410–12 (use of quotation from book review comparing book to work of renowned author on book jacket was incidental use because purpose of use was to inform public of nature of book being sold)." *Groden,* at 6–7.

"Had defendants merely used plaintiff's name in the Advertisement, that use would clearly fall within the incidental use exception under the above-cited precedents. The fact that the Advertisement also contained Groden's photograph, which defendants concede does not appear in the Book, cannot transform a privileged use into an unlawful use because the goal of the Advertisement— to inform potential readers about the contents of the Book and induce them to purchase it—remains unchanged." *Groden,* at 8.

This court concurs with the Southern District of New York. The incidental use privilege is applicable to the circumstances at issue in this case. Random House is not culpable for infringement of Lane's right of publicity, misappropriation of his celebrity, nor appropriation of his personal identity.

## V. FALSE LIGHT

Lane claims that Random House sullied his reputation and disparaged his credibility by knowingly depicting him in a false light and thereby intentionally causing him mental anguish and emotional distress. False light invasion of privacy is defined as follows:

One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Restatement (Second) of Torts § 652E (1977).

The second prong for false light—knowledge or reckless disregard of the falsity of the underlying statement—is the same "actual malice" requirement for a defamation action set forth in *Sullivan,* 376 U.S. at 279–80, 84 S.Ct. at 725–26. Whereas an action for defamation redresses damage to one's reputation, the tort of false light is intended to remedy mental distress from having been exposed to public view. "Yet, truth or assertion of opinion are defenses in both causes of action." *White v. Fraternal Order of Police,* 909 F.2d 512, 518 (D.C.Cir. 1990) (citing *Rinsley v. Brandt,* 700 F.2d 1304, 1307 (10th Cir.1983)). Moreover, the same absolute and conditional privileges available to libel defendants may be invoked in defense of false light claims. *See* Restatement (Second) of Torts §§ 652F, 652G (1977). As we shall see below, Random House has colorable defenses against defamation. By law, these defenses are valid against false light as well.

With respect to the "highly offensive" prong of the standard, Random House correctly observes that challenging Lane's views by calling them "misleading" is hardly the repugnant conduct necessary to sustain a false light claim. Indeed, it lies comfortably within the boundaries of rough and tumble debate which should have been anticipated by Lane upon publication of his own contentious bestseller. "Those who step into areas of public dispute, who choose the pleasures and distractions of controversy, must be willing to bear criticism, disparagement, and even wounding assessments." *Ollman v. Evans,* 750 F.2d 970, 993 (D.C.Cir.1984) (Bork, J., concurring), *cert. denied,* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985).

Of course, at this stage of the proceedings, the question the court must resolve is whether a fact-finder could rationally conclude that the aspersion to Lane is highly offensive. *Moldea v. New York Times,* 15 F.3d 1137, 1140 (D.C.Cir.) (*Moldea I*) (re-

hearing granted, reversed on other grounds, 22 F.3d 310 (D.C.Cir.) (*Moldea II*)), cert. denied, 513 U.S. 875, 115 S.Ct. 202, 130 L.Ed.2d 133 (1994). The standard is an objective one, based upon the reaction that a reasonable person would have if he or she were the subject of the Random House advertisement. *Id.*

■ Lane entered the public forum by embroiling himself in one of the most factious debates of our time. It is quite simply untenable that someone espousing Lane's views would take umbrage at the rather reserved assessment that he misled the American public. "It is only when there is such a major misrepresentation of his character, history, activities or beliefs that serious offense may reasonably be expected to be taken by a reasonable man in [Lane's] position. . . ." Restatement of Torts (Second) § 652E, cmt. c. Under Lane's lopsided rules of engagement, he gets his choice of weaponry and tactics; Random House must do battle unarmed and march openly in a straight line. A conspiracy theory warrior outfitted with Lane's acerbic tongue and pen should not expect immunity from an occasional, constrained chastisement.

Random House, in publicizing its own book has publicized Lane's as well. In the process, Random House furnished a bibliography from which varying insights on the Kennedy assassination can be extracted and scrutinized, then accepted or rejected. The court is unwilling to substitute its perspective for that of an informed readership. If Lane is aggrieved as he claims, he should know that an already burdened judicial system cannot accommodate protestations of this sort.

Lane's false light allegations are dismissed—both because the statement in the Random House advertisement does not objectively cross the "highly offensive" threshold, and for the reasons discussed below in connection with Lane's defamation claim.

## VI. DEFAMATION

In his fifth and last count, Lane claims defamation. According to Lane, Random House knew or could easily have determined that Lane had not been charged with nor convicted of misleading the American public. Nevertheless, with actual malice or extreme recklessness, Random House twice published the offending advertisement. Because the falsity of the charge was objectively determinable and likely to be believed as factual, Lane contends he was defamed.

There is, however, a very real risk in sanctioning recovery for libel under these circumstances. Debate about one of our important historical events could be stifled by threats of costly litigation. As Random House remarked in their motion for summary judgment, "To allow conspiracy theorists to haul book authors into court in an effort to punish written criticism is contrary to our tradition of arriving at truth through a robust exchange of views in the marketplace of ideas." Lane is certainly entitled to his beliefs; but it is not defamatory to criticize him. Books, editorials and talk shows are more appropriate forums than courts for this type of polemic.

Lane is well aware of a judicial disposition in favor of open and unobstructed debate. In his failed libel action as attorney for Willis Carto's Liberty Lobby, Lane and his client were told by the court: "Neither an organization nor a person who sallies forth to espouse a specific creed or conviction can resort to the courts to silence those who disagree with that viewpoint." *Carto v. Buckley*, 649 F.Supp. 502, 508 (S.D.N.Y.1986).

■ Both common law and constitutional protections are available to Random House. Ordinarily, an elementary canon mandates that courts not address a constitutional question if there is another ground on which the case can be decided. *See, e.g., Syracuse Peace Council v. F.C.C.*, 867 F.2d 654, 657 (D.C.Cir.1989), cert. denied, 493 U.S. 1019, 110 S.Ct. 717, 107 L.Ed.2d 737 (1990) (citing *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 345–48, 56 S.Ct. 466, 481–83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)). However, defamation is inextricably linked with First Amendment concerns. For that reason, courts frequently examine the constitutional implications of libel actions at the summary judgment stage. *See, e.g., Milkovich v. Lorain Journal Co.*,

497 U.S. 1, 3, 110 S.Ct. 2695, 2697, 111 L.Ed.2d 1 (1990); *White*, 909 F.2d at 523; *Ollman*, 750 F.2d at 991. "In the First Amendment area, summary procedures are even more essential.... The threat of being put to the defense of a lawsuit ... may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself...." *Washington Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C.Cir.1966), *cert. denied*, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967).

Accordingly, the court will explore the First Amendment ramifications of Lane's complaint. Although the common law fair comment privilege might also be an adequate basis upon which to grant Random House's motion for summary judgment, the court's dismissal of Lane's defamation count is grounded primarily in the First Amendment. Still, as a preliminary matter, the fair comment privilege is worth a cursory review.

### A. Fair Comment Privilege

■■■■ The common law privilege of fair comment applies where the reader is aware of the factual foundation for a comment and can therefore judge independently whether the comment is reasonable. *Milkovich*, 497 U.S. at 30 n. 7, 110 S.Ct. at 2712 n. 7, (Brennan, J., dissenting). Fair comments are not actionable in defamation "[b]ecause the reader understands that such supported opinions represent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts...." *Moldea I*, 15 F.3d at 1144. In the District of Columbia, the fair comment privilege can be invoked even if the underlying facts are not included with the comment. *Fisher v. Washington Post Co.*, 212 A.2d 335, 338 (D.C.1965) (relying on *Sullivan v. Meyer*, 141 F.2d 21 (D.C.Cir.), *cert. denied*, 322 U.S. 743, 64 S.Ct. 1145, 88 L.Ed. 1575 (1944)).

■■■■ Here, application of the privilege is straightforward. Lane's direct quote is included in the Random House advertisement and the reader is urged to read *Case Closed* (or the works of any or all of the six conspiracists) for a fuller explication of the competing viewpoints. The inclusion of the underlying facts, directly in the form of a quotation and indirectly in the form of a booklist, more than complies with this circuit's criteria for applying the fair comment privilege. *See also, Potomac Valve and Fitting, Inc. v. Crawford Fitting Co.*, 829 F.2d 1280, 1290 (4th Cir.1987) (challenged statement not actionable because "premises are explicit, and the reader is by no means required to share [defendant's] conclusion").

### B. First Amendment Protection

■■■■ The precepts governing the interrelationship between defamation and First Amendment jurisprudence were recently set forth in *Milkovich*, 497 U.S. at 18–21, 110 S.Ct. at 2705–07. To be defamatory, a statement must be "objectively verifiable" as true or false. *Id.* at 21, 110 S.Ct. at 2707. To insure room for "imaginative expression" and "rhetorical hyperbole," statements are only actionable if they have an explicit or implicit factual foundation. *Id.* at 20, 110 S.Ct. at 2706. Full constitutional protection exists for rhetoric that, due to its loose, figurative tone cannot reasonably be interpreted as stating actual facts about an individual, and for imprecise statements that are not susceptible of being proved true or false. *Id.* at 20–21, 110 S.Ct. at 2706–07.

The Seventh Circuit expanded upon the *Milkovich* formulation. "[I]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir.1993) (citations omitted).

■■■■ "GUILTY OF MISLEADING THE AMERICAN PUBLIC," would seem the ideal prototype of a statement that conforms to the *Milkovich–Haynes* model. It is rhetorical hyperbole; it does not state actual facts about an individual; it cannot be proven true or false. The statement in the Random House advertisement "could not reasonably be interpreted as stating anything other than a subjective belief." *Groden* at 14. Gerald Posner's evaluation in *Case Closed* is that Lane misled the public. That evaluation cannot be objectively verified without resolving

thirty years of controversy surrounding the Kennedy assassination. To the extent that Posner's opinion rests on underlying facts, those facts are lodged in his and Lane's books. Events discussed in the two books have resisted objective verification for more than three decades. Readers may believe one book, the other, or neither; but there is no indication that Lane's theories have acquired the imprimatur of received wisdom.

▮ Prior to *Milkovich*, this circuit recognized a strict dichotomy in defamation actions between assertions of opinion and assertions of fact. *See, e.g., Ollman*, 750 F.2d at 971. *Milkovich* rejected this practice. Post–*Milkovich* cases held that opinions can be actionable if they imply a provably false fact. *See, e.g., White*, 909 F.2d at 522. Thus, the task is to "determine as a threshold matter whether a challenged statement is capable of a defamatory meaning; and whether it is verifiable—that is, whether a plaintiff can prove that it is false." *Moldea II*, 22 F.3d at 316–17 (citing *Moldea I*, 15 F.3d at 1142–45). The burden of proving falsity rests squarely on the plaintiff. He or she must demonstrate either that the statement is factual and untrue, or an opinion based implicitly on facts that are untrue.

Applying these principles in a context not far removed from the dispute the court grapples with today, the D.C. Circuit concluded: "[W]hen a reviewer offers commentary that is tied to the work being reviewed, and that is a supportable interpretation of the author's work, that interpretation does not present a verifiable issue of fact that can be actionable in defamation." *Moldea II*, 22 F.3d at 313. The context in *Moldea II* was a book review "in which the allegedly libelous statements were evaluations quintessentially of a type readers expect to find in that genre." *Id.* at 315. It was Moldea's book at issue, not his character, reputation or competence as a journalist. While a bad review inevitably injures an author's reputation to some extent, "criticism's long and impressive pedigree persuades us that, while a critic's latitude is not unlimited, he or she must be given the constitutional 'breathing space' appropriate to the genre." *Id.* (citing *Sullivan*, 376 U.S. at 272, 84 S.Ct. at 721).

Lane insists that his case against Random House is not about who killed President Kennedy. Instead, Random House has accused Lane in no uncertain terms of being guilty of a public deceit, of duplicity and intellectual dishonesty. Random House implied that Lane has been exposed as a charlatan. Indeed, attests Lane, Random House's charges can be proven false; his veracity, integrity, intellectual honesty and candor can all be plumbed in a trial as a matter of fact.

▮ If Random House had said what Lane said it said, perhaps we would have a more perplexing case. Even then, it is difficult to imagine how the court could assess Lane's deceitfulness, veracity, etc. without examining the assassination itself. Reckless disregard for the truth might qualify Lane for some of Random House's unstated pejoratives; but the "truth" has remained camouflaged since 1963, notwithstanding protracted analysis and debate. In *Milkovich* terms, if the underlying facts are not "objectively verifiable," the opinion based upon those facts is not actionable. 497 U.S. at 21, 110 S.Ct. at 2707. In *White* terms, "[a]ssertions of opinion on a matter of public concern . . . receive full constitutional protection if they do not contain a provably false factual connotation." 909 F.2d at 522. The challenged Random House statement has no provably false connotation, nor does it imply provable facts.

Moreover, Random House simply did not mention candor, integrity, duplicity, charlatanism or the other colorful terminology conjured up by Lane. The advertisement expressly said: "guilty of misleading the American public." "Guilty" is defined as "justly chargeable with or responsible for a usually grave breach of conduct." *Webster's Ninth New Collegiate Dictionary* 542 (1990). In this instance, the breach of conduct is misleading the public. "Mislead" is not synonymous with "deceive." The latter implies "imposing a false idea or belief," while the former is merely "a leading astray that *may or may not be intentional.*" *Id.* at 329 (emphasis added). Whether or not Lane has been exposed as a charlatan, one would be hard-pressed to pluck that insinuation from the comparatively bland charge in the Random House advertisement. "Even the . . .

assertion that appellants are 'blatantly misleading the public' ... is subjective and imprecise, and therefore not capable of verification or refutation by means of objective proof." *Phantom Touring, Inc. v. Affiliated Publications,* 953 F.2d 724, 728 n. 7 (1st Cir.), *cert. denied,* 504 U.S. 974, 112 S.Ct. 2942, 119 L.Ed.2d 567 (1992).

The contested statement in the Random House advertisement reflects differing interpretations of the murky facts surrounding the Kennedy assassination. By "expressing a point of view only ... the challenged language is immune from liability." *Phantom Touring,* 953 F.2d at 729. *Groden* concurs: "[K]nown evidence concerning the Kennedy assassination and the extensive debate over the Warren Commission's findings demonstrate that the actual facts will never be verifiable to everyone's satisfaction. Thus, the statements in the advertisement are merely statements of Posner's argument or opinion...." *Groden* at 14–15.

### C. Commercial Speech Implications

Lane complains that Random House's purpose in advertising the Posner book was purely commercial. In *Central Hudson,* the Supreme Court sanctioned regulation of commercial speech, applying a level of scrutiny less strict than that reserved for non-commercial political speech. *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Commn. of New York,* 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980). Ergo, even though the Kennedy assassination was an event of immense public importance and interest, an advertisement is of lower pedigree than political speech and therefore not entitled to full protection. Lane subscribes to the *Central Hudson* characterization: "[M]any, if not most, products may be tied to public concerns.... [But there] is no reason for providing similar constitutional protection when such statements are made only in the context of commercial transactions." *Id.* at 563 n. 5, 100 S.Ct. at 2349 n. 5.

On the other hand, the Supreme Court has also held that protected speech remains protected even if styled as a solicitation to purchase. "[I]f the allegedly libelous statements would otherwise be constitutionally protected ... they do not forfeit that

protection because they were published in the form of a paid advertisement." *Sullivan,* 376 U.S. at 266, 84 S.Ct. at 718. "[S]peech does not lose its First Amendment protection because money is spent to project it, as in a paid advertisement of one form or another." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 761, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976).

The critical question is whether the promotional material relates to a speech product that is itself protected. "[T]he mere fact that the statements appear in advertisements does not compel the conclusion that the statements are commercial." *National Life Ins. Co. v. Phillips Publishing, Inc.,* 793 F.Supp. 627, 645 (D.Md.1992). "Defendants' economic motivation ... is not enough to turn the statements into commercial speech." *Id.* at 644. In the specific context of the Random House advertisement, the underlying product is a book. Accordingly, it is essential to identify and protect "advertising which summarizes an argument or opinion contained in the book." *Groden,* at 13.

As Random House fittingly observed, the challenged advertisement is not about laundry detergent; it cannot be divorced from the book *Case Closed;* and the book is protected speech. There are 19 references to Lane in Posner's book. Lane and the other conspiracy theorists are featured in the advertisement, in part, because *Case Closed* dissects their theories in painstaking detail. The court finds no justification for categorizing the Random House advertisement as commercial speech, nor for diminishing the constitutional safeguards to which it is properly entitled.

## VII. ATTORNEYS' FEES

Random House has cited no applicable statutory exception to the American rule that each party shall bear its own legal fees. None of the statutory exceptions known to the court seem applicable to this case. Nor has Random House documented behavior by Lane that might be considered sanctionable under 28 U.S.C. § 1927, or under Fed.R.Civ. P. 11, 16(f), 26(g), 37 or 45(c). Absent such

showing, the court has no basis upon which to grant Random House's request for attorneys' fees.

## VIII. CONCLUSION

For reasons more fully set forth above, the motion for summary judgment by defendant Random House is granted on all five counts. Costs shall be apportioned in accordance with Fed.R.Civ.P. 54(d)(1) and Local Rule 214. Random House's request for attorneys' fees is denied.

Mark Lane might well profit from Jefferson's sage advice: "I laid it down as a law to myself, to take no notice of the thousand calumnies issued against me, but to trust my character to my own conduct, and the good sense and candor of my fellow citizens." If nonetheless Lane is affronted by such minor provocations as the court addresses today, he may elect to minimize his exposure by opting for a lower public profile. More likely, having acknowledged that publicity is the lifeblood of his career, Lane will have to overcome his brittleness—or seek solace elsewhere than from this court.