[No. B160586. Second Dist., Div. One. Jan. 27, 2004.]

OMAR REZEC et al., Plaintiffs and Respondents, v.
SONY PICTURES ENTERTAINMENT, INC., Defendant and Appellant.

 

## COUNSEL

O'Melveny & Myers, Robert M. Schwartz, Marvin S. Putnam and Ruth M. Moore for Defendant and Appellant.

Blumenthal & Markham, Norman B. Blumenthal, David R. Markham, Kyle R. Nordrehaug; Prongay & Borderud, Kevin M. Prongay, Jon W. Borderud; Philip C. Cifarelli; Alan Himmelfarb; and Henry A. Koransky for Plaintiffs and Respondents.

## OPINION

**MALLANO, J.**—In marketing its films, a motion picture studio advertised films by falsely portraying a person as a film critic for a newspaper and attributing to him laudatory reviews about the films. Certain film viewers filed this lawsuit under the California unfair competition law (Bus. & Prof. Code, § 17200 et seq.), the false advertising law (*id.*, § 17500 et seq.) and the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.) seeking injunctive relief, restitution and disgorgement.

The studio filed a special motion to strike the complaint, claiming it was a strategic lawsuit against public participation (SLAPP suit) (Code Civ. Proc., § 425.16). The trial court denied the motion and the studio has appealed. We conclude that this is not a SLAPP suit because, although the films themselves enjoy full First Amendment protection, the film advertisements do not.

I

## BACKGROUND

Defendant Sony Pictures Entertainment, Inc. (Sony), released four motion pictures in 2000 and 2001 entitled Vertical Limit, The Animal, A Knight's Tale, and Hollow Man. Without the knowledge of senior management, one of Sony's employees, who created advertisements for these films, inserted quotations attributed to David Manning, who, according to the ad, worked for the Ridgefield Press in Ridgefield, Connecticut, as a film critic. But no one by that name worked at the Ridgefield Press, and the quoted material had not appeared in that newspaper.

An advertisement for the March 2001 release of A Knight's Tale noted accurately that Roger Ebert and Richard Roeper gave the film "Two Thumbs Up" and that Peter Travers of Rolling Stone said, "Forget the hard-sell generic blockbusters heading for the multiplexes. The Real Deal is coming in under the radar." The advertisement noted falsely that David Manning of the Ridgefield Press said, "Heath Ledger is this year's Hottest New Star."

Similarly, a May 2001 advertisement for The Animal included an accurate quotation from a Fox-TV reviewer that the film was "[t]he comedy hit of the summer" and another critic characterized it as "[u]proariously funny. A laugh riot." It noted falsely that David Manning of the Ridgefield Press said, "The producing team of *Big Daddy* has delivered another winner."

An August 2000 advertisement for Hollow Man quoted a genuine television critic as stating, "Grab your jaw and hold on tight because it will drop when you see the special effects in *Hollow Man*," as well as another genuine critic's assessment that the "[s]pectacular visual effects take the invisible man concept to a whole new level." The advertisement noted falsely that David Manning of the Ridgefield Press said, "One hell of a scary ride! The summer's best special effects."

Sony's senior management learned of the false advertising in May 2001, when Newsweek magazine discovered that David Manning was not a reviewer for the Ridgefield Press. The Newsweek article called upon Sony to "apologize and pull the ads." Sony apologized and withdrew the advertisements, suspended the responsible employee and his immediate supervisor, and adopted stringent policies to prevent a recurrence of such conduct.

## II

## DISCUSSION

The threshold issue on appeal is whether this is a SLAPP suit arising out of free speech protected by the United States Constitution (U.S. Const., 1st Amend.) and the California Constitution (Cal. Const., art. I, § 2, subd. (a)).[1] Code of Civil Procedure section 425.16, subdivision (b), provides: "A cause of action against a person arising from any act of that person in furtherance

---

[1] We apply the same analysis under both Constitutions. (See *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 959, 969 [119 Cal.Rptr.2d 296, 45 P.3d 243], cert. granted (2003) 537 U.S. 1099 [154 L.Ed.2d 767, 123 S.Ct. 817], cert. dism. as improvidently granted (2003) 156 L.Ed.2d 580 [123 S.Ct. 2554]; see also *Golden Gateway Center v. Golden Gateway Tenants Assn.* (2001) 26 Cal.4th 1013, 1022–1033 [111 Cal.Rptr.2d 336, 29 P.3d 797].) For convenience, we use the term "First Amendment" to refer to the free speech guarantees contained in both the federal and state Constitutions.

of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

". . . In making its determination, the court shall consider the pleadings, and the supporting and opposing affidavits stating the facts upon which the liability or defense is based. . . ." (Hereafter section 425.16.)

This statute extends to "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right . . . of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

Section 425.16 is directed against suits known as strategic lawsuits against public participation, or SLAPP suits. These are " ' "civil lawsuits . . . aimed at preventing citizens from exercising their political rights or punishing those who have done so." [Citation.]' [Citation.]" (*Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 645 [49 Cal.Rptr.2d 620], disapproved on another point in *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 68, fn. 5 [124 Cal.Rptr.2d 507, 52 P.3d 685].) Such suits "are brought, not to vindicate a legal right, but rather to interfere with the defendant's ability to pursue his or her interests." (*Church of Scientology v. Wollersheim, supra*, 42 Cal.App.4th at p. 645.) The aim is to force the defendants to devote time, energy and money to combat the lawsuit long enough for the plaintiff to accomplish his underlying objectives. (*Ibid.*)

Section 425.16 "shall be construed broadly." (*Id.*, subd. (a).) The party making a special motion to strike must make a prima facie showing that the plaintiff's cause of action arises from the defendant's free speech or petition activity. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 [124 Cal.Rptr.2d 530, 52 P.3d 703]; *Church of Scientology v. Wollersheim, supra*, 42 Cal.App.4th at p. 646.) Once the defendant makes a prima facie showing, "the burden shifts to the plaintiff to . . . 'make a prima facie showing of *facts* which would, if proved at trial, support a judgment in plaintiff's favor.' " (*Church of Scientology, supra*, 42 Cal.App.4th at p. 646, italics added; accord, *Navellier, supra*, 29 Cal.4th at p. 88.)

In making these determinations, the trial court considers the pleadings and the supporting and opposing affidavits setting forth the facts upon which liability or defense is predicated. (§ 425.16, subd. (b)(2); *Church of Scientology v. Wollersheim, supra,* 42 Cal.App.4th at p. 646.) On appeal, we review the trial court's determinations de novo. (*Lam v. Ngo* (2001) 91 Cal.App.4th 832, 845 [111 Cal.Rptr.2d 582].)

California's consumer protection laws, like the unfair competition law, govern only *commercial* speech. (See *Kasky v. Nike, Inc., supra,* 27 Cal.4th at pp. 953–956, 962, 969–970; *Keimer v. Buena Vista Books, Inc.* (1999) 75 Cal.App.4th 1220, 1230–1231 [89 Cal.Rptr.2d 781]; *O'Connor v. Superior Court* (1986) 177 Cal.App.3d 1013, 1018–1020 [223 Cal.Rptr. 357].) Noncommercial speech is beyond their reach. (*Ibid.*)

For purposes of the anti-SLAPP statute, if Sony's film advertisements constitute commercial speech, the statute does not apply because the ads did not "further[] . . . [Sony's] right of petition or free speech [arising] under the United States or California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1); see *Nagel v. Twin Laboratories, Inc.* (2003) 109 Cal.App.4th 39, 46–51 [134 Cal.Rptr.2d 420].) The trial court found that the ads were commercial speech. We agree.

When a communication takes the form of an advertisement, refers to a specific product, and the communicator has an economic motivation in publishing the advertisement, there is "strong·support" for the conclusion that the advertisement is commercial speech. (*Bolger v. Youngs Drug Products Corp.* (1983) 463 U.S. 60, 66–67 [77 L.Ed.2d 469, 103 S.Ct. 2875].) This is true even though the communication also discusses important public issues. (*Id.* at pp. 67–68.) "[A]dvertising which 'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech. . . . Advertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues." (*Id.* at p. 68.)

As our Supreme Court has explained: "[W]hen a court must decide whether particular speech may be subjected to laws aimed at preventing false advertising or other forms of commercial deception, categorizing a particular statement as commercial or noncommercial speech requires consideration of three elements: the speaker, the intended audience, and the content of the message.

"In typical commercial speech cases, the speaker is likely to be someone engaged in commerce—that is, generally, the production, distribution, or sale of goods or services—or someone acting on behalf of a person so engaged,

and the intended audience is likely to be actual or potential buyers or customers of the speaker's goods or services, or persons acting for actual or potential buyers or customers, or persons (such as reporters or reviewers) likely to repeat the message to or otherwise influence actual or potential buyers or customers. . . .

"[I]n deciding whether speech is commercial, two relevant considerations are advertising format and economic motivation. . . . These considerations imply that commercial speech generally or typically is directed to an audience of persons who may be influenced by that speech to engage in a commercial transaction with the speaker or the person on whose behalf the speaker is acting. Speech in advertising format typically, although not invariably, is speech about a product or service by a person who is offering that product or service at a price, directed to persons who may want, and be willing to pay for, that product or service. . . . Economic motivation likewise implies that the speech is intended to lead to commercial transactions, which in turn assumes that the speaker and the target audience are persons who will engage in those transactions, or their agents or intermediaries.

"Finally, the factual content of the message should be commercial in character. In the context of regulation of false or misleading advertising, this typically means that the speech consists of representations of fact about the business operations, products, or services of the speaker (or the individual or company that the speaker represents), made for the purpose of promoting sales of, or other commercial transactions in, the speaker's products or services." (*Kasky v. Nike, Inc.*, *supra*, 27 Cal.4th at pp. 960–961, italics omitted.) In short, commercial speech is "speech that does 'no more than propose a commercial transaction' . . . ." (*Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 486 [101 Cal.Rptr.2d 470, 12 P.3d 720]; accord, *Kasky v. Nike, Inc.*, *supra*, 27 Cal.4th at p. 974 (dis. opn. of Chin, J.).)

Here, the first element in determining the type of speech—a commercial speaker—is satisfied because Sony is engaged in the business of marketing films. The second element—an intended commercial audience—is met because Sony's advertisements reach potential moviegoers who may be influenced by the ads to pay the price of admission to see its films. And the factual content of the advertisements is commercial because Sony represented to the public that someone named David Manning had commented favorably on its films when, in fact, no one by that name worked at the Ridgefield Press, and the ascribed reviews never appeared in that newspaper. Sony's ads therefore proposed a commercial transaction, nothing more.

Sony counters that "a different conclusion may be appropriate in a case where the [communication] advertises an activity itself protected by the First

Amendment." (*Bolger v. Youngs Drug Products Corp.*, *supra*, 463 U.S. at p. 67, fn. 14.) "The critical question is whether the promotional material relates to a speech product that is itself protected. 'The mere fact that the statements appear in advertisements does not compel the conclusion that the statements are commercial.' [Citation.] 'Defendants' economic motivation . . . is not enough to turn the statements into commercial speech.' [Citation.]" (*Lane v. Random House, Inc.* (D.D.C. 1995) 985 F.Supp. 141, 152.)

The films reviewed in Sony's advertisements constitute noncommercial speech under the First Amendment notwithstanding any economic motivation in making them. (See *Joseph Burstyn, Inc. v. Wilson* (1952) 343 U.S. 495, 501–502 [96 L.Ed. 1098, 72 S.Ct. 777]; *Guglielmi v. Spelling-Goldberg Productions* (1979) 25 Cal.3d 860, 865–869 [160 Cal.Rptr. 352, 603 P.2d 454] (conc. opn. of Bird, C. J.) (*Guglielmi*);[2] *Polydoros v. Twentieth Century Fox Film Corp.* (1997) 67 Cal.App.4th 318, 323–324 [79 Cal. Rtpr. 2d 207].) Sony argues that, because the films themselves are noncommercial speech, so are the advertisements. Under Sony's absolutist approach, every film advertisement, no matter how false, would be outside the scope of consumer protection laws. We reject that position.

By way of example, "[i]n *Guglielmi*[, *supra*, 25 Cal.3d 860], and *Page v. Something Weird Video* (C.D.Cal. 1996) 960 F.Supp. 1438 . . . , the courts held that promotional use of celebrities' true likenesses on a video and a made for television movie were not actionable because the use was incidental to the publication of the constitutionally protected materials. Although not asked to resolve the issue, both courts commented on the importance of distinguishing between truthful and false promotions, with constitutional protection inuring to the former, but not to the latter." (*Keimer v. Buena Vista Books, Inc.*, *supra*, 75 Cal.App.4th at p. 1232, italics omitted.)

Had the advertisements here been "merely . . . adjunct[s] to the exhibition of the film[s]" (*Guglielmi*, *supra*, 25 Cal.3d at p. 872), such as by using photographs of actors in the films, Sony would have a point because, just as the films are noncommercial speech, so is an advertisement reflecting their content. (See *Guglielmi*, *supra*, 25 Cal.3d at pp. 872–873; *Polydoros v. Twentieth Century Fox Film Corp.*, *supra*, 67 Cal.App.4th at p. 325.)

■ But in this case, the advertisements did not reflect any character or portion of the films. Rather, they contained a fictitious critic's favorable

---

[2] The Chief Justice's opinion in *Guglielmi*, although designated a concurring opinion, commanded the support of three other justices, giving it the weight of a majority opinion. (See *Comedy III Productions, Inc. v. Gary Saderup, Inc.* (2001) 25 Cal.4th 387, 396, fn. 7 [106 Cal.Rptr.2d 126, 21 P.3d 797].) All further references to *Guglielmi* are to the Chief Justice's opinion.

opinion of the films. As such, the advertisements constitute commercial speech and are subject to regulation under consumer protection laws. (See *Keimer v. Buena Vista Books, Inc., supra*, 75 Cal.App.4th at pp. 1230–1233.)

By the same token, we reject Sony's argument that, because the public is interested in films, the advertisements are necessarily "an issue of public interest" within the meaning of the anti-SLAPP statute. (See *Consumer Justice Center v. Trimedica International, Inc.* (2003) 107 Cal.App.4th 595, 600–602 [132 Cal.Rptr.2d 191].) Nor do Sony's advertisements constitute noncommercial speech on the theory that they were widely disseminated. (See *ibid.*) Such a rule would simply encourage the widest possible publication of false advertisements and reward the most notorious of false advertisers.

Sony's case authority does not suggest otherwise. In *Lane v. Random House, Inc., supra*, 985 F.Supp. 141, the plaintiff filed suit for defamation based on information about him that appeared in an advertisement for a book. The court granted summary judgment in favor of the advertiser because "it is essential to identify and protect 'advertising which summarizes an argument or opinion contained in the book.' " (*Id.* at p. 152; see also *Keimer v. Buena Vista Books, Inc., supra*, 75 Cal.App.4th at p. 1232 [distinguishing *Lane*].)

In *Page v. Something Weird Video, supra*, 960 F.Supp. 1438, a manufacturer and distributor of videocassettes used drawings of the plaintiff to advertise a movie in which she starred. The plaintiff claimed that the ad misappropriated her likeness. The court disagreed, noting that "[p]laintiff does not argue that the drawings depict anything other than what the viewers can expect to see in the films." (*Id.* at p. 1444; see also *Keimer v. Buena Vista Books, Inc., supra*, 75 Cal.App.4th at p. 1232 [distinguishing *Page*].)

And in *Seale v. Gramercy Pictures* (E.D.Pa. 1996) 949 F.Supp. 331, which concerned a film about Bobby Seale's participation in the Black Panthers, the court rejected Seale's common law cause of action for infringement of the right of publicity, stating:

"[U]se of a person's name and likeness to advertise a novel, play, or motion picture concerning that individual is not actionable as an infringement of the right of publicity. . . .

". . .'The flaw in plaintiff's position is that a public figure has no exclusive rights to his or her own life story, and others need no consent or permission of the subject to write a biography of a celebrity.'

"Moreover, in addressing *right of publicity claims*, courts have been mindful that the First Amendment provides greater protection to works of

artistic expression such as movies, plays, books, and songs, than it provides to pure 'commercial' speech." (*Seale v. Gramercy Pictures, supra,* 949 F.Supp. at pp. 336–337, italics added.) None of these cases supports Sony's position.

In *Keimer v. Buena Vista Books, Inc., supra,* 75 Cal.App.4th 1220, the advertiser made an argument similar to Sony's, and the court found it wanting, stating: "We turn to the crux of [the advertiser's] argument, which is that if a book's content is noncommercial and entitled to First Amendment protection, then material taken from that content and used in advertising is also entitled to full First Amendment protection. We do not dwell at length on the argument, because a review of [the advertiser's] authorities reveals that each is materially distinguishable from the matter before us . . . . [Some] *involved the infringement on rights which are less zealously protected than the right of consumers to be free from false advertising*[, *such as the right of publicity*]." (*Id.* at p. 1231, italics added.)

Finally, as a practical matter, Sony's position would shield all sorts of mischief. For example, a film could be advertised as having garnered "Three Golden Globe Nominations" when it had received none. An advertiser of a biography could use the word "autobiographical" even though the subject of the work had nothing to do with its creation and had renounced it from the beginning. And a newspaper or magazine could promote itself to customers who run ads by grossly inflating its circulation numbers.

Because we have concluded that Sony did not make a prima facie showing that the advertisements arose from protected First Amendment rights, we do not decide whether plaintiffs made a sufficient showing as to the merits of their claims. (See § 425.16, subd. (b)(1).) We therefore do not determine whether plaintiffs have stated a viable cause of action under any of the statutes on which this action is based.

## III

## DISPOSITION

The order denying defendant's special motion to strike is affirmed. The parties are to bear their own costs.

Spencer, P. J., concurred.

**ORTEGA, J.,** Dissenting.—This is the most frivolous case with which I have *ever* had to deal. Imagine the great contribution this case will make to our quality of life and to justice in America. Why, it may eventually protect us all from war, pestilence, famine and death. A new day will dawn from which time no one will ever again be fooled by a promotion touting a movie as the greatest artistic accomplishment of the ages. From that day on, all persons will be able to absolutely rely on the truth and accuracy of movie ads. No longer will people be seen lurching like mindless zombies toward the movie theater, compelled by a puff piece. What a noble and overwhelming undertaking. The only losers will be those poor souls who do not go to the movies. But, such is life. Someone always gets left behind.

While the vast majority of actions taken by lawyers contribute to the public good, counsel here are providing nothing even approaching rectification of a legitimate wrong. I cannot see breathing life into this farce. We should be occupying ourselves with resolving legitimate disputes instead of laughable cases designed not to gain anything for the plaintiffs, but rather to generate fees for the only true beneficiaries of this disgrace, the attorneys. That said, it now becomes necessary to discuss the merits of the SLAPP motion, which should have been granted and upheld on appeal.

The anti-SLAPP statute was intended "to provide a mechanism for the *early* termination of claims that are improperly aimed at the exercise of free speech or the right of petition. (See *Paul for Council v. Hanyecz* [(2001)] 85 Cal.App.4th 1356, 1364 [102 Cal.Rptr.2d 864] ['the anti-SLAPP legislation found in section 425.16 provides an efficient means of dispatching, early on in a lawsuit, a plaintiff's meritless claims'].)" (*Lam v. Ngo* (2001) 91 Cal.App.4th 832, 841 [111 Cal.Rptr.2d 582].)

"The basic two-prong framework for analyzing an anti-SLAPP suit motion is well established. First prong: Has the defendant shown that the causes of action he or she is attacking arise from acts in furtherance of the right of free speech or petition? [Citation.]" (*Lam v. Ngo, supra,* 91 Cal.App.4th at p. 845.) "The second prong focuses on the 'probability' that the plaintiff will prevail on the claim [citation], which case law has refined into an inquiry as to whether the *plaintiff* has made a 'prima facie showing of facts' that, if proved at trial, would support a judgment in the plaintiff's favor. [Citation.] Thus an important substantive aspect of the law is that, once it has been shown a cause of action is based on the defendant's exercise of free speech or petition, it is the plaintiff who has the burden of making a prima facie case of prevailing." (*Ibid.*)

In my view, defendant has prevailed under both prongs, and the anti-SLAPP suit motion should have been granted.

## The Movie Advertisements Are Protected Speech

It is undisputed that movies such as Vertical Limit, The Animal, A Knight's Tale, and Hollow Man are works of fiction and, as such, are a form of constitutionally protected speech.[1] It is also undisputed that movies are of significant public interest. "It cannot be doubted that motion pictures are a significant medium for the communication of ideas. They may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression. The importance of motion pictures as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as to inform." (*Joseph Burstyn, Inc. v. Wilson* (1952) 343 U.S. 495, 501 [96 L.Ed. 1098, 72 S.Ct. 777], fn. omitted.) The fact that movies are made for private profit does not diminish the fact movies are "a form of expression whose liberty is safeguarded by the First Amendment." (*Id.* at pp. 501–502, fn. omitted.)

Considering the disputed David Manning movie reviews/advertisements purely for their *substance* or *content*—that Heath Ledger was the "Hottest New Star," that The Animal was "another winner," that Hollow Man was "a scary ride" with the "summer's best special effects"—reasonable minds must agree the *substance* of the advertisements was neither false, misleading, nor likely to deceive the reasonable consumer. The substance or content of the David Manning advertisements, consisting of either opinion or " 'rhetorical hyperbole [which] cannot be proven true or false[,]' was not actionable. [Citation.]" (*Keimer v. Buena Vista Books, Inc.* (1999) 75 Cal.App.4th 1220, 1232 [89 Cal.Rptr.2d 781].)

"[A]dvertising statements which were true, or were opinion or 'rhetorical hyperbole' and thus were not verifiably false or misleading," are not actionable under the Unfair Practices Act. (*Keimer v. Buena Vista Books, Inc., supra,* 75 Cal.App.4th at p. 1231.) " ' "[R]hetorical hyperbole' " [citation] or 'loose, figurative, or hyperbolic language' which would 'negate the impression that the writer was seriously maintaining' a proposition that

---

[1] "It is clear that works of fiction are constitutionally protected in the same manner as political treatises and topical news stories. Using fiction as a vehicle, commentaries on our values, habits, customs, laws, prejudices, justice, heritage and future are frequently expressed. What may be difficult to communicate or understand when factually reported may be poignant and powerful if offered in satire, science fiction or parable. Indeed, Dickens and Dostoevski may well have written more trenchant and comprehensive commentaries on their times than any factual recitation could ever yield. Such authors are no less entitled to express their views than the town crier with the daily news or the philosopher with his discourse on the nature of justice. Even the author who creates distracting tales for amusement is entitled to constitutional protection. [Citations.]" (*Guglielmi v. Spelling-Goldberg Productions* (1979) 25 Cal.3d 860, 867–868 (conc. opn. of Bird, C. J.) [160 Cal.Rptr. 352, 603 P.2d 454], fn. omitted.)

was 'sufficiently factual to be susceptible of being proved true or false' is protected. [Citation.]" (*Lam v. Ngo, supra,* 91 Cal.App.4th at p. 849.)

The David Manning advertisements were undeniably false, but only in one regard—there was false attribution in that David Manning is *not* a film critic for The Ridgefield Press. The majority assumes that because the attribution was false, that is the end of the discussion. There is, however, much more to be considered.

Quotations are used to convey what the speaker said. "More accurately, the quotation allows the subject to speak for himself." (*Masson v New Yorker Magazine, Inc.* (1991) 501 U.S. 496, 519 [115 L.Ed.2d 447, 111 S.Ct. 2419].) While the misuse of quotations generally "diminish[es] to a great degree the trustworthiness of the printed word and eliminate[s] the real meaning of quotations" (*id.* at p. 520), it cannot be overemphasized that here, the *content* of the David Manning quotations, consisting entirely of either opinion or rhetorical hyperbole, was neither verifiably false nor potentially misleading to rational consumers.

In the context of consumer protection laws and their goal of protecting the public from potentially misleading advertising, the fact that David Manning is *not* a film critic for The Ridgefield Press is of so little significance as to have no effect, as a matter of law, upon a reasonable consumer. (See *People v. Cole* (2003) 113 Cal.App.4th 955, 979–982 [7 Cal.Rptr.3d 333].) David Manning is an unknown, perhaps even fictitious, person, with no public following in the movie world or any other realm, to my knowledge. This is not a case where the defendant has falsely attributed favorable reviews to a recognized film critic whose opinion might carry weight with some movie viewers.

In this unique situation, where the substance of the quotations is neither misleading nor actionable, the misattribution of the quotations, while false, was not *materially* deceptive to the reasonable consumer. Accordingly, despite the misattribution, the advertisements may not be considered materially false or potentially misleading, because the misattribution could not possibly have had a material effect on the mind of the reader. (Cf. *Morningstar, Inc. v. Superior Court* (1994) 23 Cal.App.4th 676, 687 [29 Cal.Rptr.2d 547] ["Even assuming it does, unless Pilgrim's premise is the rankings are false, we do not see how attributing the rankings to Lipper would change the effect of the. article on its readers. '[T]he statement is not considered false unless it "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." [Sack, Libel, Slander, and Related Problems (1980) p. 138]' (*Masson* v. *New Yorker Magazine, Inc., supra,* 501 U.S. at p. 517.)"].)

None of the cases cited by the majority are on point; all are distinguishable. In particular, *Keimer v. Buena Vista Books, Inc., supra,* 75 Cal.App.4th 1220, is distinguishable because it involved advertisements containing verifiably false statements of *fact,* and not the sort of opinion or rhetorical hyperbole involved in this case. Because this case involves only statements of opinion and rhetorical hyperbole that are not actionable, there is no danger that granting the special motion to strike would permit false advertisements containing verifiably false statements of fact.

### Plaintiff Has No Probability of Success

As stated above, no reasonable consumer could possibly be misled by the false attribution of the nonactionable quotations to David Manning for The Ridgefield Press. Contrary to the majority opinion's implication, moviegoers are not such morons. Plaintiff has no probability of succeeding on the merits. (See *People v. Cole, supra,* 113 Cal.App.4th at pp. 979–982; *Lam v. Ngo, supra,* 91 Cal.App.4th at pp. 848–849.)

Accordingly, I would reverse the order and direct the trial court to grant the special motion to strike.

On February 26, 2004, the opinion was modified to read as printed above.