Filed 9/13/18 (unmodified opinion attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| VERA SEROVA, | B280526 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC548468) |
| v. | |
| SONY MUSIC ENTERTAINMENT et al., | ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT] |
| Defendants and Appellants. | |

THE COURT:

It is ordered that the opinion filed herein on August 28, 2018, be modified as follows:

On page 23, first full paragraph, after the third sentence ending "statement of opinion rather than fact," add as footnote 8 the following footnote, which will require renumbering of all subsequent footnotes:

[Fn. 8:] In her petition for rehearing, Serova argues that Appellants' challenged statements on the Album Cover and in the Promotional Video were statements of fact, not opinion, because consumers would have understood them to be factual assertions about the identity of the lead singer of the songs in the album.

This argument misunderstands the issue.  The question here is not whether Appellants have a defense to Serova's claims because their challenged statements were truthful assertions of opinion rather than alleged false statements of fact.  In that context, focus on the listener's understanding is appropriate.  (See, e.g., *Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260–261 [applying a " 'totality of the circumstances' " test in a libel action to determine whether a statement was one of fact or opinion].)  Rather, the question here is whether Appellants' challenged speech was commercial.  Under the court's analysis in *Kasky*, the *speaker's* knowledge about the content of the speech is the important feature in answering that question.  Nike's challenged speech in that case concerned its own business operations which were within its personal knowledge.  (*Kasky, supra,* 27 Cal.4th at p. 963.)  That is not the case here, as Appellants were not involved in the initial recordings of the Disputed Tracks.  From Appellants' perspective, their challenged statements about the identity of the lead singer were therefore necessarily opinion.  [End of fn. 8.]

There is no change in the judgment.

Serova's petition for rehearing is denied.

_____

LUI, P. J.                          CHAVEZ, J.                          HOFFSTADT, J.

2

Filed 8/28/18 (unmodified version)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| VERA SEROVA, | B280526 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC548468) |
| v. | |
| SONY MUSIC ENTERTAINMENT et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County. Ann I. Jones, Judge. Affirmed in part and reversed in part.

Katten Muchin Rosenman, Zia F. Modabber, Andrew J. Demko, Charlotte S. Wasserstein; Kinsella Weitzman Iser Kump & Aldisert, Howard Weitzman and Suann C. Macisaac for Defendants and Appellants.

Moss Bollinger, Ari E. Moss and Jeremy F. Bollinger for Plaintiff and Respondent.

_____

Defendants and appellants Sony Music Entertainment (Sony), John Branca, as co-executor of the estate of Michael J. Jackson (the Estate), and MJJ Productions, Inc. (collectively Appellants) appeal from an order of the superior court partially denying their motion to strike under the anti-SLAPP statute. (Code Civ. Proc., § 425.16.)[1]  Plaintiff and respondent Vera Serova (Serova) filed this putative class action against Appellants and other defendants for marketing a posthumous Michael Jackson album entitled simply *Michael.*  Serova claims that the album cover and a promotional video misleadingly represented that Jackson was the lead singer on each of the 10 vocal tracks on the album, when in fact he was not the lead singer on three of those tracks.

Serova alleged claims under the Unfair Competition Law (UCL; Bus.& Prof. Code, § 17200 et seq.) and the Consumers Legal Remedies Act (CLRA; Civ. Code, § 1750 et seq.).  Serova also brought a fraud claim against defendants Edward Joseph Cascio, James Victor Porte, and Cascio's production company, Angelikson Productions, LLC (collectively, the Cascio Defendants), alleging that those defendants knowingly misrepresented to Appellants that Jackson was the lead singer on the three tracks at issue (the Disputed Tracks).[2]

---

[1] Subsequent undesignated statutory references are to the Code of Civil Procedure.  "SLAPP" is an acronym for "[s]trategic lawsuit against public participation."  (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1109, fn. 1.)

[2] The Cascio Defendants are not parties to this appeal.

Appellants brought an anti-SLAPP motion, which the trial court granted in part but denied with respect to the two communications at issue in this appeal. The trial court concluded that the album cover, including statements about the contents of the album, and a promotional video for the album were commercial speech that was subject to regulation under the UCL and the CLRA.

We reverse this portion of the trial court's order. We conclude that the challenged representation—that Michael Jackson was the lead singer on the three Disputed Tracks—did not simply promote sale of the album, but also stated a position on a disputed issue of public interest. Before the album was released, certain Jackson family members and others publicly claimed that Jackson was not the lead singer on the Disputed Tracks. Appellants disputed this claim. An attorney acting for the Estate released a public statement outlining the steps Appellants had taken to verify the authenticity of the tracks by consulting with experts and persons who were familiar with Jackson's voice and recordings.

Thus, the identity of the artist on the three Disputed Tracks was a controversial issue of interest to Michael Jackson fans and others who care about his musical legacy. The identity of the lead singer was also integral to the artistic significance of the songs themselves. Under these circumstances, Appellants' statements about the identity of the artist were not simply commercial speech but were subject to full First Amendment protection. They are therefore outside the scope of an actionable unfair competition or consumer protection claim in this case.

# BACKGROUND

## 1. *The Anti-SLAPP Procedure*

Section 425.16 provides for a "special motion to strike" when a plaintiff asserts claims against a person "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1).) Such claims must be stricken "unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (*Ibid.*)

Thus, ruling on an anti-SLAPP motion involves a two-step procedure. First, the moving defendant must show that the challenged claims arise from protected activity. (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 396; *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056.) Second, if the defendant makes such a showing, the "burden shifts to the plaintiff to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated." (*Baral*, at p. 396.) Without resolving evidentiary conflicts, the court determines "whether the plaintiff's showing, if accepted by the trier of fact, would be sufficient to sustain a favorable judgment." (*Ibid.*)

Section 425.16, subdivision (e) defines the categories of acts that are in " 'furtherance of a person's right of petition or free speech.' " Those categories include "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest," and "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(3) & (4).)

In 2003 the Legislature enacted section 425.17 to curb "a disturbing abuse of Section 425.16 . . . which has undermined the exercise of the constitutional rights of freedom of speech and petition for the redress of grievances, contrary to the purpose and intent of Section 425.16." (§ 425.17, subd. (a).) Section 425.17 seeks to accomplish that goal by expressly excluding several categories of claims from the scope of section 425.16.

Section 425.17, subdivision (c) establishes such an exclusion for claims concerning commercial speech. That subdivision provides that section 425.16 does not apply to "any cause of action brought against a person primarily engaged in the business of selling or leasing goods or services" if certain conditions exist, including that: (1) the statement at issue "consists of representations of fact about that person's or a business competitor's business operations, goods, or services" that was made to promote commercial transactions or was made "in the course of delivering the person's goods or services;" and (2) the intended audience is an actual or potential customer or a person likely to influence a customer. (§ 425.17, subd. (c)(1) & (2).)

Section 425.17 contains certain specifically defined exceptions. One of those exceptions states that the commercial speech provision in section 425.17, subdivision (c) does not apply to "[a]ny action against any person or entity based upon the creation, dissemination, exhibition, advertisement, or other similar promotion of any dramatic, literary, musical, political, or artistic work." (§ 425.17, subd. (d)(2).)

5

## 2. *Serova's Allegations*[3]

The album *Michael* was released on or about December 14, 2010, about 18 months after Michael Jackson's death. Sony released the album in conjunction with the Estate.

The album contained 10 songs. Serova alleges that the three songs on the Disputed Tracks—"Breaking News," "Monster," and "Keep Your Head Up" (the Songs)—have been controversial "[s]ince *Michael's* inception."

Serova claims that the Cascio Defendants recorded the initial versions of the Disputed Tracks and had "exclusive knowledge" that the lead vocals for the Songs were actually performed by a singer other than Michael Jackson. Serova alleges that Cascio then falsely represented to Appellants that Michael Jackson was the singer.

Prior to *Michael's* release, various members of Michael Jackson's family and others familiar with his recordings disputed whether he was the lead singer on the Disputed Tracks. In response to those concerns, Sony and the Estate (through Attorney Howard Weitzman) both publicly issued statements confirming their belief that Jackson was the singer.

In his statement (the Weitzman Statement), Weitzman explained that many persons who were familiar with Jackson's work had confirmed that he was the lead singer on the Disputed

---

[3] As explained below, the trial court ruled on Appellant's anti-SLAPP motion based upon the allegations in Serova's First Amended Complaint (Complaint) and a stipulation that established certain background facts for purposes of the motion only. Thus, the relevant facts are primarily those alleged in the Complaint.

6

Tracks, including former producers, engineers, performers, and directors who had worked with Jackson. He stated that the Estate and Sony had also retained forensic musicologists who examined the Disputed Tracks and concluded that the lead singer was actually Jackson. He also stated that he had spoken to the singer whom some persons had "wrongfully alleged was a 'soundalike' singer that was hired to sing" on the Disputed Tracks, and that the singer had denied any involvement with the project. Weitzman explained that, "given the overwhelming objective evidence resulting from the exhaustive investigations," Sony decided to include the Disputed Tracks on the album "because they believed, without reservation, that the lead vocal[s] on all of those tracks were sung by Michael Jackson."

The album cover for *Michael* (Album Cover) included a statement that " '[t]his album contains 9 previously unreleased vocal tracks performed by Michael Jackson.' "[4] A video released before the album (the Promotional Video) described *Michael* as " 'a brand new album from the greatest artist of all time.' " While appearing on the Oprah Winfrey show, Cascio also stated that Jackson performed the lead vocals on the Disputed Tracks.

The Complaint alleges that the lead singer on the Disputed Tracks actually sounds like the "soundalike" singer mentioned in the Weitzman Statement. Serova claims she discovered evidence indicating that the lead singer on the Disputed Tracks was not Michael Jackson. Among other things, she claims that: (1) Cascio did not produce any "demos, outtakes, alternate takes,

---

[4] One of the tracks on the album had been previously recorded.

7

and multi-track recordings" when requested; (2) Jackson never mentioned that he had recorded the Songs; (3) the Songs did not appear on a list of ongoing or planned projects found in Michael Jackson's house after his death; and (4) various persons that the Weitzman Statement said had confirmed that the lead singer on the Disputed Tracks was Jackson in fact had doubts about that conclusion.

Serova also hired an audio expert who prepared a report concluding that Michael Jackson "very likely did not sing" the lead vocals on the Disputed Tracks. The report was peer-reviewed by another expert who concluded that the study's "methodologies and conclusions were reasonable."

The Complaint alleges claims against all defendants under the CLRA and UCL, and asserts a fraud claim against the Cascio Defendants only. The Complaint claims that thousands of putative class members purchased *Michael* and lost "money or property" as a result of the alleged misleading representations.

### 3. *Appellants' Anti-SLAPP Motion*

Appellants and the Cascio Defendants filed motions to strike under section 425.16. Appellants argued that Serova's claims arose from protected speech under prong one of the anti-SLAPP procedure. With respect to prong two, Appellants argued that Serova could not succeed on her claims against them because their challenged statements about the identity of the lead singer on the Disputed Tracks were noncommercial speech as a matter of law and no reasonable consumer could find the statements misleading.

To permit a ruling on the anti-SLAPP motions in advance of discovery, the parties stipulated that, "solely for purposes of this determination on the Motions," Michael Jackson did not sing the lead vocals on the three Disputed Tracks (the Stipulation).

The parties also stipulated to the authenticity of copies of the Weitzman Statement, the Album Cover, and the Promotional Video.

The trial court granted the defendants' motions with respect to allegations concerning the Weitzman Statement and Cascio's statement on the Oprah Winfrey show, but denied the motions with respect to allegations concerning statements on the Album Cover and in the Promotional Video.

Under prong one of the anti-SLAPP procedure, the trial court ruled that all the statements addressed in the defendants' motions arose from conduct in furtherance of the defendants' right of free speech concerning an issue of public interest. The court concluded that the Weitzman Statement was "made in a public forum about a matter of public interest." The court reasoned that the Weitzman Statement "responded to a matter of public concern, i.e., the authenticity of certain recordings released posthumously and claimed to have been written and recorded by a pop superstar." Similarly, the court concluded that Cascio's statement on the Oprah Winfrey show addressed "the same controversy."

In contrast, the trial court concluded that the Album Cover and the Promotional Video were simply promotional materials that "did not speak to the controversy surrounding the performance [or] address or refute" the allegations concerning the Disputed Tracks. The court nevertheless found that statements on the Album Cover and in the Promotional Video arose from protected conduct because "Michael Jackson's professional standing and accomplishments created legitimate and widespread attention to the release of a new album."

With respect to prong two, the trial court found that the Weitzman Statement and Cascio's statements on the Oprah

9

Winfrey show were noncommercial speech. The court concluded that those statements were not made to promote or sell the album, but addressed "a controversy regarding the veracity of the claims surrounding the release of the album."

However, the court concluded that the challenged statements on the Album Cover and in the Promotional Video were advertisements constituting commercial speech. The court rejected the defendants' argument that this speech was "inextricably intertwined" with the Songs themselves under *Riley v. Nat'l Fed'n of Blind* (1988) 487 U.S. 781, 796 (*Riley*). The court reasoned that "[n]othing in this case prevented Defendants from giving the album a different title and look or from electing not to attest to the authenticity of the recordings on the cover or in a commercial."

The court also found that, assuming (pursuant to the parties' Stipulation) that Michael Jackson was not actually the lead singer on the Disputed Tracks, both the Album Cover and the Promotional Video were likely to deceive a reasonable consumer. The court concluded that images of Michael Jackson and the challenged statements on the Album Cover, along with the lack of any attribution to others, conveyed the message that Jackson was the lead singer on the Disputed Tracks. The court also concluded that a reasonable consumer would believe that Michael Jackson was the "artist" referenced in the statement on the Promotional Video that *Michael* was " 'a brand new album from the greatest artist of all time.' "

## DISCUSSION

Appellants challenge the trial court's rulings that: (1) the Promotional Video and the Album Cover were commercial speech that may be subject to claims under the UCL and CLRA; and

(2) the representations in those materials were likely to deceive a reasonable consumer.  Serova argues that those rulings were correct, and also asserts as an alternative ground for affirmance that her claims do not "arise from" protected free speech activity under prong one of the anti-SLAPP procedure.  (See *Klem v. Access Ins. Co.* (2017) 17 Cal.App.5th 595, 609 ["A prevailing party on an anti-SLAPP motion need not file a cross-appeal to preserve his disagreement with the trial court's reasoning"].)[5]

We apply a de novo standard of review to the trial court's rulings on the anti-SLAPP motion.  (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.)

1.  ***Serova's Claims Concerning the Promotional Video and the Album Cover Arise from Appellants' Right of Free Speech Under the United States and California Constitutions***

Appellants claim the trial court correctly concluded that their challenged conduct arose from protected speech concerning an issue of public interest, but also suggest that we need not reach that issue.  Appellants argue that the Legislature's decision to create an exception for the marketing of musical works under section 425.17, subdivision (d)(2) shows a legislative intent that such speech "is eligible for anti-SLAPP protection," which is

---

[5] Serova did not appeal from the trial court's ruling granting the defendants' anti-SLAPP motion with respect to the Weitzman e-mail and Cascio's statement during the Oprah Winfrey interview.  Thus, the only claims at issue in this appeal concern the representations in the Promotional Video and the Album Cover.

11

"essentially dispositive of step one of the anti-SLAPP analysis." We first consider that argument.

    **a.**     *The significance of the Legislature's exclusion of music advertisements from the scope of section 425.17*

As mentioned, section 425.17, subdivision (d)(2) provides that the "creation, dissemination, exhibition, advertisement, or other similar promotion of any dramatic, literary, musical, political, or artistic work" is outside the scope of the commercial speech provision in section 425.17, subdivision (c). The exception in section 425.17, subdivision (d)(2) certainly means that the promotion of a musical work is not included within the categories of conduct that the Legislature specifically stated were not subject to anti-SLAPP relief. However, the Legislature's decision to *exclude* the advertising of musical works from section 425.17 does not mean that it also intended to afford anti-SLAPP protection to such conduct in every circumstance, regardless of the requirements of section 425.16.

Such a conclusion would be inconsistent with the Legislature's stated intent. The Legislature specifically stated that it enacted section 425.17 to curb *abuses* of the anti-SLAPP law that were "contrary to the purpose and intent of Section 425.16." (§ 425.17, subd. (a).) That statement suggests that our Legislature was concerned that the courts were granting too broad a reading to what constitutes "protected" conduct under section 425.16, subdivision (e). Appellants' argument, if accepted, would commit that very same sin because it would require courts to treat the types of speech delineated in section 425.17, subdivision (d)(2) as subject to the anti-SLAPP law without any showing that such speech meets the definition of "protected" conduct under section 425.16, subdivision (e).

12

The interpretation that Appellants suggest would also be inconsistent with the definitions of protected conduct under section 425.16. Section 425.16, subdivision (e)(3) and (4) each require that protected conduct must have some connection to a "public issue" or an "issue of public interest." Appellants' interpretation of section 425.17, subdivision (d)(2) ignores that requirement. For example, an action challenging an advertisement falsely claiming that a musical album contains a particular song would be an action "based upon the . . . advertisement" of a musical work. (§ 425.17, subd. (d)(2).) Appellants do not provide any reason to believe that the Legislature intended to provide automatic anti-SLAPP protection to such a mundane commercial misrepresentation simply because the statement was made in connection with the advertisement of a musical work. (Cf. *Rezec v. Sony Pictures Entertainment, Inc.* (2004) 116 Cal.App.4th 135, 143–144 (*Rezec*) [advertisement referring to a purported movie endorsement by a fictional music critic did not concern an issue of public interest just "because the public is interested in films"].)

The court in *Dyer v. Childress* (2007) 147 Cal.App.4th 1273 rejected a similar argument. After reviewing the legislative history concerning section 425.17, subdivision (d)(2), the court rejected the defendant's claim that "by expressly exempting motion pictures from the anti-SLAPP limitations imposed in section 425.17, subdivisions (b) and (c), the Legislature acknowledged that motion pictures are more deserving of protection than other forms of expression not enumerated." (*Id.* at pp. 1283–1284.) The court concluded that "[t]he exclusion of motion pictures from the exemptions to the limitations set forth in section 425.17, subdivisions (b) and (c) means only that anti-SLAPP motions remain available to defendants who are creators

13

and distributors of motion pictures . . . . [¶] The exception of section 425.17, subdivision (d)(2) *does not eliminate the need to show significant public interest in the conduct at the heart of the plaintiff's complaint* or expand the scope of the anti-SLAPP law to provide protection to motion picture defendants in every context." (*Id.* at p. 1284.)

Similarly, the exception of section 425.17, subdivision (d)(2) does not provide anti-SLAPP protection to sellers of music in every context. We therefore must consider whether Appellants' challenged statements were made "in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

### b. *The challenged promotional statements in this case*

Serova claims that Appellants' statements about the identity of the lead singer on the Disputed Tracks were simply claims about the contents of a commercial product that Appellants offered for sale. We disagree that the representation at issue was so limited. Serova's own allegations describe the public controversy concerning the Disputed Tracks. Moreover, a significant body of case law holds that prominent entertainers and their accomplishments can be the subjects of public interest for purposes of the anti-SLAPP statute.

The Complaint alleges that, "[b]efore *Michael's* release, numerous people familiar with Michael Jackson's voice disputed the authenticity" of the Disputed Tracks. As discussed above, Sony and the Estate released public statements in response, including the detailed Weitzman Statement. Serova further alleges that, "[s]ince *Michael's* inception, controversy has surrounded three of the album's ten songs."

Public interest in the life and work of entertainers and other celebrities can create an "issue of public interest" for

14

purposes of section 425.16, subdivision (e). " ' "[T]here is a public interest which attaches to people who, by their accomplishments, mode of living, professional standing or calling, create a legitimate and widespread attention to their activities." ' " (*Stewart v. Rolling Stone LLC* (2010) 181 Cal.App.4th 664, 677–678 (*Stewart*), quoting *Eastwood v. Superior Court* (1983) 149 Cal.App.3d 409, 422; see also *No Doubt v. Activision Publishing, Inc.* (2011) 192 Cal.App.4th 1018, 1027 [video game distributor's use of band members' likenesses in a video game was a "matter of public interest because of the widespread fame" of the band]; *Hall v. Time Warner, Inc.* (2007) 153 Cal.App.4th 1337, 1347 [Marlon Brando's decisions concerning the distribution of his assets was an issue of public interest].) It is beyond dispute that Michael Jackson was a famous entertainer.

Facts concerning the creation of works of art and entertainment can also be an issue of public interest for purposes of the anti-SLAPP statute. For example, in *Kronemyer v. Internet Movie Database Inc.* (2007) 150 Cal.App.4th 941, the plaintiff challenged the omission of his name from the credits listed for the movie "My Big Fat Greek Wedding" on a widely visited website. (*Id.* at p. 944.) The court concluded that the movie "was a topic of widespread public interest," and the website was a public forum. (*Id.* at pp. 949–950.) Accordingly, the plaintiff's action challenging the listings was "within the ambit of section 425.16, subdivision (e)(3) and (4)." (*Id.* at p. 950; see also *Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 143–144 [there was a "public interest in the writing, casting and broadcasting" of a television episode for purposes of the anti-SLAPP statute].)

Similarly, here, there was significant interest in the release of the posthumous album *Michael.* Whether or not the lead singer on the Disputed Tracks was actually Michael Jackson was

15

therefore also a matter of significant public interest, as confirmed by Serova's own allegations.

This public controversy distinguishes this case from cases that Serova cites concerning allegedly misleading descriptions of a particular commercial product or service. (See *Consumer Justice Center v. Trimedica International, Inc.* (2003) 107 Cal.App.4th 595, 599, 601 [claims about a pill for breast enlargement]; *Nagel v. Twin Laboratories, Inc.* (2003) 109 Cal.App.4th 39, 43–46 [list of ingredients on labels for nutritional and dietary supplements]; *Scott v. Metabolife Internat., Inc.* (2004) 115 Cal.App.4th 404, 423 [claims about the safety and efficacy of a particular weight loss product]; *L.A. Taxi Cooperative, Inc. v. The Independent Taxi Owners Assn. of Los Angeles* (2015) 239 Cal.App.4th 918, 921, 927–928 [alleged misleading advertisements concerning contact information for companies providing taxi services]; *Jewett v. Capital One Bank* (2003) 113 Cal.App.4th 805, 814–816 [alleged false statements in credit card solicitations].)

The representations at issue here concerned the body of work of a well-known artist and an album containing his songs that generated significant public attention. We therefore conclude that the issue was one of "public interest" for purposes of section 425.16, subdivision (e)(3) and (4).

2. *The Challenged Statements Were Noncommercial Speech Outside the Scope of Serova's Consumer Protection Claims*

Appellants argue that Serova cannot show a probability of success on her UCL and CLRA claims under prong two of the anti-SLAPP analysis because those statutes only apply to commercial speech. They claim that their challenged statements about the lead singer on the Disputed Tracks were not

16

commercial speech, or, if they were, that those statements were inextricably intertwined with the protected contents of the Songs themselves.

Appellants argue that the consumer protection claims that Serova asserts against them apply only to commercial speech. A number of cases support that assertion. (See *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 952 (*Kasky*) [identifying criteria for determining whether speech may constitutionally be regulated as commercial speech under California's false advertising laws]; *Rezec, supra,* 116 Cal.App.4th at p. 140 [California's consumer protection laws, like the unfair competition law, govern only *commercial* speech]; *Keimer v. Buena Vista Books, Inc.* (1999) 75 Cal.App.4th 1220, 1231 (*Keimer*) [Bus. & Prof. Code, §§ 17200 et seq. and 17500 et seq. do not "seek to restrict noncommercial speech in any manner"]; *O'Connor v. Superior Court* (1986) 177 Cal.App.3d 1013, 1019.) Serova does not dispute this. Moreover, she did not argue below and does not argue on appeal that Appellants' challenged statements are actionable even if they are noncommercial speech. Thus, if Appellant's challenged statements are noncommercial speech Serova's claims against them must be stricken.

### a. *Identifying commercial speech*

Restrictions on purely commercial speech are subject to a lesser level of scrutiny than are " 'other constitutionally safeguarded forms of expression.' " (*Kasky, supra,* 27 Cal.4th at p. 952, quoting *Bolger v. Youngs Drug Products Corp.* (1983) 463 U.S. 60, 64–65 (*Bolger*).) Moreover, "commercial speech that is false or misleading is not entitled to First Amendment protection and 'may be prohibited entirely.' " (*Kasky,* at p. 953, quoting *In re R.M.J.* (1982) 455 U.S. 191, 203.)

17

The United States Supreme Court first held that commercial speech is entitled to some constitutional protection in *Bigelow v. Virginia* (1975) 421 U.S. 809. In *Bigelow*, the court rejected the proposition that "advertising, as such, was entitled to no First Amendment protection." (*Id.* at p. 825.) Following that decision, courts have had to grapple with the distinction between expressive activities that are merely commercial in nature and those that are subject to more stringent First Amendment protection.

In *Bolger, supra*, the court held that materials distributed by a manufacturer of contraceptives, including both promotional flyers and informational pamphlets about contraceptives, were commercial speech. (463 U.S. at pp. 62, 66–68.) Most of the mailings at issue fell "within the core notion of commercial speech—'speech which does "no more than propose a commercial transaction." ' " (*Id.* at p. 66, quoting *Virginia State Bd. of Pharmacy  v. Virginia Citizens Consumer Council* (1976) 425 U.S. 748, 762 (*Virginia Pharmacy*).) However, the informational pamphlets required further analysis. The court identified three factors indicating that the pamphlets were commercial speech: (1) the pamphlets were "conceded to be advertisements"; (2) they referred to a specific product; and (3) the defendant had an economic motivation for mailing them. (*Bolger*, at pp. 66–67.) The court stated that none of these factors alone was sufficient to show that the speech was commercial, but "[t]he combination of *all* these characteristics . . . provides strong support" for the decision that the informational pamphlets were commercial speech. (*Id.* at p. 67.)

In *Kasky, supra,* 27 Cal.4th 939, our Supreme Court considered the factors the court identified in *Bolger, supra*, 463 U.S. 60, along with other relevant United States Supreme Court

18

precedent and crafted a "limited-purpose" test for identifying commercial speech. The test applies when, as here, "*a court must decide whether particular speech may be subjected to laws aimed at preventing false advertising or other forms of commercial deception.*" (*Kasky,* at p. 960.) The court directed that a court faced with such a decision should consider "three elements: the speaker, the intended audience, and the content of the message." (*Ibid.*)

The court in *Kasky* applied those factors to the allegations that the defendant, Nike, made false statements about labor practices in its own business operations. (27 Cal.4th at pp. 969–970.) The court held that these alleged statements constituted commercial speech that was actionable under California's consumer protection laws. (*Ibid.*)

**b.** ***Appellants' challenged statements***

Applying the three-factor test for identifying commercial speech described in *Kasky,* we conclude that Appellants' challenged representations were noncommercial speech.

The first two factors—the speaker and the intended audience—both suggest a commercial purpose. Appellants were "engaged in commerce" in making representations on the Album Cover and on the Promotional Video to sell the album. (*Kasky, supra,* 27 Cal.4th at p. 963.) And the audience for those representations was potential purchasers of the album. (*Id.* at p. 964.)

However, the third factor—the *content* of the challenged speech—shows that the speech at issue here is critically different from the type of speech that may be regulated as purely commercial speech under *Kasky*. That is so for two reasons. First, Appellants' challenged statements concerned a publicly disputed issue about which they had no personal knowledge.

19

Second, the statements were directly connected to music that itself enjoyed full protection under the First Amendment.

### i. *Personal knowledge*

The court in *Kasky* explained that, "at least in relation to regulations aimed at protecting consumers from false and misleading promotional practices, commercial speech must consist of factual representations about the business operations, products, or services of the speaker (or the individual or company on whose behalf the speaker is speaking), made for the purpose of promoting sales of, or other commercial transactions in, the speaker's products or services." (27 Cal.4th at p. 962.) This requirement relates directly to the reasons for denying First Amendment protection to false or misleading commercial speech. As the court explained, the United States Supreme Court "has stated that false or misleading commercial speech may be prohibited because the truth of commercial speech is 'more easily verifiable by its disseminator' and because commercial speech, being motivated by the desire for economic profit, is less likely than noncommercial speech to be chilled by proper regulation." (*Ibid.*, quoting *Virginia Pharmacy*, *supra*, 425 U.S. at p. 772, fn. 24.)

These factors were important for the court's ruling. The court in *Kasky* ascribed great significance to the fact that, "[i]n describing its own labor policies, and the practices and working conditions in factories where its products are made, Nike was making factual representations about *its own business operations*." (27 Cal.4th at p. 963, italics added.) The court concluded that "Nike was in a position to readily verify the truth of any factual assertions it made on these topics," and that commercial regulation was "unlikely to deter Nike from speaking truthfully or at all about the conditions in its factories." (*Ibid.*)

Here, Appellants' representations about the identity of the lead singer on the Disputed Tracks did not concern their own business operations or a fact of which they had personal knowledge. Serova alleges that the Cascio Defendants, not Appellants, "jointly created, produced, and recorded the initial versions" of the Disputed Tracks. She claims that the "lead vocals on these songs were performed by another singer under the direction, and with the knowledge, cooperation, participation, and substantial assistance of the Cascio Defendants." And she further alleges that the Cascio Defendants had "*exclusive knowledge* of the fact that Jackson did not perform the songs." (Italics added.)[6]

As discussed above, Appellants' challenged statements in the Promotional Video and on the Album Cover concerned an issue of public interest and debate—whether the three songs on the Disputed Tracks should be included in Michael Jackson's body of work. Appellants did not record the songs and, according to Serova's allegations, were themselves deceived about the identity of the singer. Appellants' statements therefore lacked the critical element of personal knowledge under the *Kasky* standard.

---

[6] As mentioned above, the parties stipulated below for purposes of the anti-SLAPP motions that Michael Jackson did not sing the lead vocals on the three Disputed Tracks. Accordingly, for purposes of their appeal, Appellants state that they accept "that Jackson did not sing the lead vocals" on the Disputed Tracks. However, Appellants did not stipulate that they *knew* the identity of the singer.

As the trial court correctly concluded, Appellants'
statements directly addressing the public controversy about the
identity of the singer—including the Weitzman Statement—were
noncommercial.  The challenged statements on the Album Cover
and the Promotional Video also staked out a position in that
controversy by identifying the singer as Michael Jackson.  The
fact that those statements were made in the context of promoting
the album does not change their constitutional significance.

Economic motivation is only one of the factors, insufficient
in itself, that may indicate that speech is commercial.  (*Bolger,
supra,* 463 U.S. at p. 67.)  As our Supreme Court explained in
*Kasky,* whether speech is commercial or noncommercial should
take account of the *reasons* for affording commercial speech less
constitutional protection.  (27 Cal.4th at pp. 958, 965.)  The court
in *Kasky* recognized that the speech at issue in that case—Nike's
statements about labor practices in the factories that
manufactured its products—addressed an issue of public interest.
The reason that Nike's speech could be subject to regulation
under the state's unfair competition and false advertising laws
was that it concerned facts about Nike's own business operations,
which were " 'more easily verifiable' " and " 'less likely to be
chilled by proper regulation' " than other speech about the
publicly-debated issue of international labor practices.  (*Id.* at pp.
965, 967, quoting *Virginia Pharmacy, supra,* 425 U.S. at p. 772,
fn. 24.)  The court cautioned that it did not purport to decide
whether speech should be considered commercial if all of the
factors that the court identified—including the element of

22

personal knowledge about one's own business operations—were not present. (*Kasky*, at p. 964.)[7]

The absence of the element of personal knowledge is highly significant here. Because Appellants lacked actual knowledge of the identity of the lead singer on the Disputed Tracks, they could only draw a conclusion about that issue from their own research and the available evidence. Under these circumstances, Appellant's representations about the identity of the singer amounted to a statement of opinion rather than fact. (Cf. *Bernardo v. Planned Parenthood Federation of America* (2004) 115 Cal.App.4th 322, 348 [statements of opinion on Planned Parenthood's website concerning scientific research about abortion and breast cancer were not commercial speech].)

The lack of personal knowledge here also means that Appellants' challenged statements do not fit the definition of speech that is " 'less likely to be chilled by proper regulation.' " (*Kasky, supra,* 27 Cal.4th at p. 965, quoting *Virginia Pharmacy, supra,* 425 U.S. at p. 772, fn. 24.) The "regulation" at issue here is the UCL and the CLRA. Serova could obtain relief under these consumer protection statutes without proof of intentional or willful conduct. (See *Kasky*, at pp. 980–981 (dis. opn. of

---

[7] For example, the court might well have reached a different conclusion in *Kasky* if the statements at issue concerned the labor practices of an independent commercial supplier who simply sold products to Nike for resale. The court specifically noted that Nike had entered into a memorandum of understanding assuming responsibility for its subcontractors' compliance with local labor laws. (*Kasky, supra,* 27 Cal.4th at p. 947.)

23

Brown, J.; *Podolsky v. First Healthcare Corp.* (1996) 50 Cal.App.4th 632, 647 [violation of the UCL is a "strict liability offense"].)[8]  Thus, to avoid possible liability for a mistaken judgment about the lead singer on the Disputed Tracks, Appellants would have needed to either: (1) provide disclaimers about the singer's identity in its marketing materials; or (2) omit the Disputed Tracks from the album.[9]

The chilling effect of the second option is obvious.  But the first option also has First Amendment implications.  The United States Supreme Court recently emphasized the potentially problematic nature of regulations that compel speech, even in a commercial context.  In *Nat'l Inst. of Family & Life Advocates v. Becerra* (2018) ___ U.S. ___, 201 L.Ed.2d 835 (*Life Advocates*), the court held that a California law requiring notices in health care clinics concerning available health care services, including

---

[8] The CLRA does provide for a good faith defense to an action for damages, but the defense requires proof of "appropriate correction, repair or replacement or other remedy of the goods and services."  (See Civ. Code, §§ 1782, subds. (b) & (c), and 1784.)  In contrast to the consumer claims asserted against Appellants, Serova's fraud claim against the Cascio Defendants of course does include a scienter element.  That claim is still pending in the trial court.

[9] The record illustrates this dilemma.  During oral argument, the trial court suggested that Appellants could have avoided legal challenge by leaving the songs at issue off of the album entirely.  The trial court's written ruling also observes that Appellants could have given the album "a different title and look" or elected "not to attest to the authenticity of the recordings on the cover or in a commercial."

24

abortion, likely violated the First Amendment.  The court declined to recognize an exception to strict scrutiny review under the First Amendment for "professional speech," noting that the court has permitted compelled disclosures only in the context of professionals' "commercial advertising" concerning " 'purely factual and uncontroversial information about the terms under which . . . services will be available.' " (*Id*. at p. 848.)  By compelling a particular disclosure, the law at issue amounted to an impermissible "content-based regulation of speech." (*Id*. at p. 846.)[10]

By compelling disclosure of the controversy over the Disputed Tracks to avoid liability, the UCL and CLRA would, in effect, require Appellants to present views in their marketing materials with which they do not agree.  The possibility that applying these unfair competition and consumer protection laws

---

[10] That the court's reasoning in *Life Advocates* has implications beyond just professional disclosures is shown by Justice Breyer's dissent, which cautions that "the majority's view, if taken literally, could radically change prior law, perhaps placing much securities law or consumer protection law at constitutional risk, depending on how broadly its exceptions are interpreted." (*Life Advocates, supra,* 201 L.Ed.2d at p. 857, dis. opn. of Breyer, J.)  The majority countered by stating that it does not "question the legality of . . . purely *factual and uncontroversial* disclosures about commercial products." (*Id*. at p. 852, italics added.)  Here, any compelled disclosure would not be "uncontroversial"; Serova herself alleges that "controversy has surrounded" the three Disputed Tracks.  Nor would it be "purely factual" from Appellants' perspective, as they had no personal knowledge of the facts.

25

to Appellants' speech would have the effect of chilling the content of that speech—whether by preventing the sale of particular musical works or by regulating the expression of a point of view on a public controversy about those works—is a further reason to conclude that the speech at issue was noncommercial.

### ii. *The relationship between the challenged statements and the art that they promoted*

Appellants' statements in the Promotional Video and on the Album Cover described and promoted the album, of which the Disputed Tracks were a part. The music on the album itself is entitled to full protection under the First Amendment. (*Stewart*, *supra*, 181 Cal.App.4th at p. 682.) The challenged statements therefore related directly to a piece of art that has independent significance under the First Amendment.

The identity of a singer, composer, or artist can be an important component of understanding the art itself. No one could reasonably dispute that knowing whether a piece of music was composed by Johann Sebastian Bach or a picture was painted by Leonardo Da Vinci informs the historical understanding of the

work.[11]  Similarly, although the art at issue is contemporary and in a different genre, whether Michael Jackson was actually the lead singer of the songs on the Disputed Tracks certainly affects the listener's understanding of their significance.  Thus, the marketing statements at issue here are unlike the purely factual product or service descriptions constituting commercial speech in cases that Serova cites.  (See *Benson v. Kwikset Corp.* (2007) 152 Cal.App.4th 1254, 1268 [representation that products were manufactured in the United States]; *Peel v. Atty. Registration & Disciplinary Comm'n* (1990) 496 U.S. 91, 99–100 [advertisement concerning attorney's certification as an expert]; *Rubin v. Coors Brewing Co.* (1995) 514 U.S. 476, 481 [descriptions of alcohol content on beer labels].)

We do not suggest that the challenged statements here are noncommercial speech *only* because they promoted an art work.  We agree with the court in *Rezec*, *supra*, 116 Cal.App.4th 135, that advertising is not necessarily excluded from the category of commercial speech simply because it promotes a product that is

---

[11] While these examples are only illustrative, they are not purely hypothetical.  (See Dutter & Nikkhah, *Bach works were written by his second wife, claims academic*, The Telegraph (Apr. 23, 2006) <http://www.telegraph.co.uk/news/uknews/1516423/Bach-works-were-written-by-his-second-wife-claims-academic.html> [as of Aug. 23, 2018]; Sayej, *Artistic License?  Experts doubt Leonardo da Vinci painted $450m Salvator Mundi*, The Guardian (Nov. 20, 2017) <https://www.theguardian.com/artanddesign/2017/nov/20/artistic-license-experts-doubt-leonardo-da-vinci-painted-450m-salvator-mundi> [as of  Aug. 23, 2018].)

itself subject to full First Amendment protection.  In *Rezec*, the court held that film advertisements that featured fictional endorsements from a nonexistent critic was commercial speech. The court rejected the "absolutist approach" that "because the films themselves are noncommercial speech, so are the advertisements." (*Id*. at p. 142.)[12]

Such an approach would ascribe full First Amendment significance to any commercial representation about a piece of art, no matter how mundane or willfully misleading.  For example, returning to the hypothetical advertisement mentioned above, there is no apparent reason why a statement falsely stating that a particular song is included in an album should be subject to full First Amendment protection simply because the statement promotes the sale of music.[13]  However, where, as

---

[12] In *Keimer*, *supra*, the court concluded that advertisements repeating "verifiably false or misleading" statements about investment returns contained in a book were commercial speech despite the fully protected status of the books themselves under the First Amendment.  (75 Cal.App.4th at p. 1231.)  The statements at issue here were not "verifiably false" based upon the information available to Appellants, so we need not consider this holding.

[13] Thus, we do not accept Appellants' suggestion that an advertisement promoting a particular piece of art is *necessarily* "inextricably intertwined" with the First Amendment content of the art itself simply because it makes a representation about the identity of the artist. (See *Riley, supra,* 487 U.S. at p. 796.)  The distinguishing features here are that:  (1) the identity of the artist was itself an issue of public discussion and interest; and (2) Appellants had no personal knowledge of the issue.

here, a challenged statement in an advertisement relates to a public controversy about the identity of an artist responsible for a particular work, and the advertiser has no personal knowledge of the artist's identity, it is appropriate to take account of the First Amendment significance of the work itself in assessing whether the content of the statement was purely commercial.

This conclusion is consistent with the flexible approach that the United States Supreme Court has adopted for identifying commercial speech. In *Bolger, supra*, the court explained that no single factor that it identified as a marker of commercial speech is sufficient in itself to classify particular speech as commercial, nor must each factor "necessarily be present in order for speech to be commercial." (463 U.S. at pp. 66–67 and fn. 14.) The court concluded that the presence of all three factors in that case "provides strong support" for the conclusion that the informational pamphlets at issue were commercial. (*Id.* at p. 67.) However, citing a prior opinion involving the advertising of religious books, the court also cautioned that "a different conclusion may be appropriate in a case where the pamphlet advertises an activity itself protected by the First Amendment." (*Id.* at p. 67, fn. 14.)

That is the situation here. The challenged statements in the Promotional Video and on the Album Cover concerned music that is "itself protected by the First Amendment." (*Bolger, supra,* 463 U.S. at p. 67, fn. 14.) While not itself dispositive, the fact that the challenged statements promoted a piece of art is appropriate to consider in assessing the *content* of the speech under the *Kasky* guidelines. (*Kasky, supra,* 27 Cal.4th at p. 961.)

**3.** ***Conclusion***

Appellant's challenged statements on the Album Cover and in the Promotional Video were noncommercial speech outside the

scope of the consumer protection claims that Serova asserts against Appellants.  As a matter of law Serova therefore cannot show a likelihood that she will prevail on her claims under prong two of the anti-SLAPP procedure, and her claims against Appellants must be stricken.  We therefore need not reach the issue of whether the challenged statements would be misleading to a reasonable consumer.

We emphasize that this holding is based on the record in this case and the issues that have been appealed.  The Cascio Defendants have not appealed, and our holding therefore does not reach any portion of the trial court's order with respect to them.  Nor do we purport to decide whether statements in another context concerning the marketing of creative works might constitute commercial speech.

## DISPOSITION

The trial court's order is affirmed in part and reversed in part.  The portions of the Complaint alleging claims against Appellants are ordered stricken.  In all other respects the trial court's order is affirmed.  Appellants are entitled to their costs on appeal.

CERTIFIED FOR PUBLICATION.


LUI, P. J.

We concur:


CHAVEZ, J.


HOFFSTADT, J.

31